UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

JERALD CRAMPTON,

                        Plaintiff,

v.                                                          3:16-CV-0356
                                                            (TWD)
COMM'R OF SOC. SEC.,

                        Defendant.
———————————————————————————

APPEARANCES:                                    OF COUNSEL:

LACHMAN & GORTON LAW FIRM                        PETER A. GORTON, ESQ.
  Counsel for Plaintiff
P.O. Box 89
1500 East Main Street
Endicott, NY 13761

U.S. SOCIAL SECURITY ADMIN.                      BENIL ABRAHAM, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
  Counsel for Defendant
26 Federal Plaza
New York, NY 10019

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>DECISION and ORDER</u>

      Currently before the Court, in this Social Security action filed by Jerald Crampton ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are Plaintiff's motion for judgment on the pleadings and Defendant's motion for judgment on the pleadings.  (Dkt. Nos. 9, 10.)  For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted in part and denied in part, and Defendant's motion for judgment on the pleadings is denied in part and granted in part.

## I.     RELEVANT BACKGROUND

### A.     Factual Background

Plaintiff was born in 1974, making him 37 years old at his alleged onset date and 40 years old at the date of the final Social Security Administration ("SSA") decision.  Plaintiff has a 10th grade education and past work as a maintenance worker.  Generally, Plaintiff alleges disability consisting of hip and back pain, arthritis, seizure disorder, pinched nerve in the neck, reading and math disorder with associated anxiety, poor sleep, history of ulcer and gastroesophageal reflux disorder, thyroid nodule, and shoulder pain.

### B.     Procedural History

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income on October 24, 2012.  Plaintiff's application was initially denied on February 25, 2013, after which he timely requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at a video hearing before ALJ Bruce S. Fein on July 29, 2014.  On October 14, 2014, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act.  (T. 12-23.[1])  On February 25, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (T. 1-3.)

### C.     The ALJ's Decision

Generally, in his decision, the ALJ made the following seven findings of fact and conclusions of law.  (T. 13-21.)  First, the ALJ found that Plaintiff is insured for disability benefits under Title II until December 31, 2018.  (T. 14.)  Second, the ALJ found that Plaintiff

---

[1]     The Administrative Transcript is found at Dkt. No. 8.  Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

has not engaged in substantial gainful activity since February 28, 2012, the alleged onset date. *Id.* Third, the ALJ found that Plaintiff's chronic lumbago, status-post total hip replacement with left hip pain, seizure disorder, learning disorder, and mood disorder are severe impairments. (T. 14-16.) Fourth, the ALJ found that Plaintiff's severe impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"). (T. 16-18.) More specifically, the ALJ considered Listing 1.02 (dysfunction of a joint), 1.04 (disorders of the spine), 11.02 (convulsive epilepsy), 11.03 (non-convulsive epilepsy), 12.02 (organic mental disorders), 12.04 (mood disorders), and 12.05 (intellectual disability). *Id.* Fifth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to

> lift/carry 20 pounds occasionally and 10 pounds frequently; stand for 6 hours out of an 8 hour workday with normal breaks; walk for 6 hours out of an 8 hour workday with normal breaks; sit for 6 hours out of an 8 hour workday with normal breaks; occasionally climb stairs, balance, kneel, stoop, crouch, and crawl; never climb ropes, ladders, or scaffolds; should avoid concentrated exposure to unprotected heights and should avoid operating machinery; and is limited to work consisting of simple, routine and repetitive tasks. The claimant has no other exertional or non-exertional limitations.

(T. 18.) Sixth, the ALJ found that Plaintiff has past relevant work as a maintenance worker, but that he is unable to perform that job with the limitations in the RFC assessment. (T. 21.) Seventh, and finally, the ALJ determined that Plaintiff was not disabled based on application of the Medical-Vocational Guidelines, finding that Plaintiff's additional non-exertional limitations had little-to-no effect on the occupational base of unskilled light work. (T. 22.)

### D.    The Parties' Briefings on Their Cross-Motions

Generally, Plaintiff asserts four arguments in support of his motion for judgment on the pleadings. First, Plaintiff argues that the ALJ made an improper credibility determination. (Dkt.

No. 9 at 7-13.[2])  Plaintiff argues that the ALJ's notation of conservative treatment was erroneous because Plaintiff underwent invasive treatments such as injection therapy, physical therapy, and hip replacement and because there was no evidence showing that more aggressive treatment was available.  *Id*. at 8.  Plaintiff also argues that the credibility determination is not supported because the ALJ did not show that Plaintiff's reported activities were comparable to full-time work and did not discuss pertinent evidence such as that related to Plaintiff's psychiatric hospitalizations, mental health treatment, and his minimization of psychiatric issues to his treatment providers.  *Id*. at 8-12.

Second, Plaintiff argues that the mental RFC is not supported by substantial evidence and asserts that "limiting Plaintiff to simple work does not necessarily properly address his psychiatric issues."  *Id*. at 12.  Plaintiff more specifically argues that the ALJ's assessment was based on "outdated and incomplete information that fails to take into account Plaintiff's most serious psychiatric decompensations."  *Id*. at 13.

Third, Plaintiff argues the ALJ improperly weighed the medical opinion evidence.  *Id*. at 13-20.  In terms of the physical opinions, Plaintiff argues that the ALJ erred in affording great weight to the opinion of consultative examiner Gilbert Jenouri, M.D., and in adopting portions of the opinion from treating physician Matthew Bennett, M.D., while rejecting other portions.  *Id*. at 13-16.  Plaintiff further argues that the ALJ erred in discounting various opinions regarding Plaintiff's ability to stand, including one from Physician Assistant ("P.A.") Paul Hodgeman.  *Id*. at 16-17.  As a final corollary, Plaintiff argues that there was a gap in the record that the ALJ

[2]     Page numbers in citations to the parties' briefs refer to the actual page numbers of the brief rather than the page number assigned by the Court's electronic filing system.

failed to develop due to the lack of an assessment of Plaintiff's ability stand and walk after his hip replacement. *Id*. at 17.

In terms of the mental opinions, Plaintiff argues that the ALJ erred in relying on opinions from the examining and non-examining consultants because these opinions were rendered prior to Plaintiff's hospitalizations and were therefore "outdated." *Id*. at 17-18. Plaintiff also argues that the non-examining consultant failed to provide a supporting explanation to show that his conclusions were justified. *Id*. at 18. Plaintiff then argues that the ALJ erred in rejecting various opinions that Plaintiff was totally disabled and in failing to re-contact those sources for clarification. *Id*. at 18-20.

Fourth, Plaintiff argues that the ALJ's Step Five determination is not supported by substantial evidence because Plaintiff's significant non-exertional impairments precluded application of the Medical-Vocational Guidelines as a framework for that determination. *Id*. at 20-21.

Generally, Defendant asserts three arguments in support of her motion for judgment on the pleadings. In response to Plaintiff's first argument, Defendant argues the ALJ's credibility determination was supported by substantial evidence. (Dkt. No. 10 at 5-8.) More specifically, Defendant argues that the ALJ did not err in considering the conservative treatment Plaintiff had received since his hip surgery, that the ALJ's consideration of Plaintiff's reported daily activities was proper, and that the ALJ properly discussed and considered evidence related to Plaintiff's mental symptoms including his two psychiatric hospitalizations. *Id*. at 4-8.

Next, in response to Plaintiff's third argument, Defendant argues that the ALJ properly weighed the medical opinion evidence. *Id*. at 8-15. More specifically, Defendant argues that the

ALJ properly weighed the opinions from Dr. Jenouri, Dr. Bennett, and P.A. Hodgeman when assessing Plaintiff's physical functional capacity. *Id*. at 8-13. Defendant also argues that the ALJ properly relied on opinions related to Plaintiff's mental functioning from State Agency psychological consultant L. Blackwell, Ph. D., examining physician Robert Russell, Ed. D., and consultative examiner Cheryl Loomis, Ph. D., because treatment records from after Plaintiff's psychiatric hospitalizations did not show greater mental limitations than the ALJ accounted for in the RFC. *Id*. at 13-15. Defendant then argues that the ALJ was not required to afford any special significance to generic opinions that Plaintiff was disabled because that is an issue reserved to the Commissioner. *Id*. at 15.

Finally, in response to Plaintiff's second and fourth argument, Defendant argues that the Step Five determination is supported by substantial evidence because the ALJ properly accounted for Plaintiff's mental limitations with a restriction to simple, routine, and repetitive tasks, and because the ALJ properly used the Medical-Vocational Guidelines as a framework for decision-making given that the additional non-exertional limitations in the RFC assessment had little to no effect on the occupational base of unskilled light work. Id. at 16-17.

## II.    RELEVANT LEGAL STANDARD

### A.    Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for

doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see alao Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984) (citation omitted).

## B.     Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act.  20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process.  *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.  Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).  "If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

III.    ANALYSIS

    A.    Whether the Credibility Determination is Supported by Substantial Evidence

    After carefully considering the matter, the Court answers this question in the affirmative

for the reasons stated in Defendant's memorandum of law.  (*See* Dkt. No. 10 at 5-8.)  To those

reasons, the Court adds the following analysis.

    In determining whether a claimant is disabled, the ALJ must also make a determination

as to the credibility of the claimant's allegations.  "An administrative law judge may properly

reject claims of severe, disabling pain after weighing the objective medical evidence in the

record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her

reasons with sufficient specificity to enable us to decide whether the determination is supported

by substantial evidence."  *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 205 (N.D.N.Y. 2012)

(quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)).  The Second Circuit

recognizes that "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," and

that "[i]f there is substantial evidence in the record to support the Commissioner's findings, the

court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."

*Id.* at 206 (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir.

1983); *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).

Due to the fact that the ALJ has "the benefit of directly observing a claimant's demeanor and

other indicia of credibility," the ALJ's credibility assessment is generally entitled to deference.

*Weather v. Astrue*, 32 F. Supp. 3d 363, 381 (N.D.N.Y. 2012) (citing *Tejada v. Apfel*, 167 F.3d

770, 776 (2d Cir. 1999)).

Here, the ALJ found that Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (T. 19.) Although the medical imaging showing degeneration of his back and left hip, treatment evidence showing antalgic gait and tenderness, and his pursuit of specialized care were consistent with Plaintiff's reports of physical symptoms, the ALJ found that the severity Plaintiff reported was not consistent with the remainder of the evidence. *Id.* The ALJ noted the fact that he had experienced only one seizure, imaging of his shoulder and cervical spine showed minimal abnormalities, his relied on conservative treatment for the symptoms, and he reported various activities of daily living. *Id.* The ALJ likewise found that, although Plaintiff's reports of mental symptoms were consistent with intelligence testing and his hospitalizations for suicidal ideation, the severity Plaintiff reported was not consistent with treatment records showing few mood abnormalities on examinations and his reported activities of daily living. *Id.* The ALJ lastly noted that Plaintiff's earnings record "[did] not enhance" his credibility. (T. 20.)

Plaintiff does not challenge that the ALJ provided specific reasons for finding his allegations were not entirely credible, but rather argues that the reasons the ALJ provided were not supported by the evidence or consistent with applicable legal standards. (Dkt. No. 9 at 8-12.) Plaintiff's arguments are unpersuasive.

Although Plaintiff's allegations were supported by some evidence, the ALJ determined that the severity of Plaintiff's physical and mental symptoms were not supported by his reported activities, which the ALJ specifically noted included cooking, getting his children ready for school, doing light housework, doing light exercise, shopping, driving, socializing with friends, weight-lifting and exercising, reading the Bible and magazines, and managing money. (T. 19.)

At the hearing, Plaintiff testified he could do dishes after which he would sit down with his feet up, do low-impact exercise such as an elliptical or exercise bike for five-to-ten minutes, mop his kitchen, pick up around the front room, cook "not often," shop, do laundry, and take out the garbage. (T. 45-49, 53-54.) He testified he can read "simple stuff" and perform simple arithmetic like adding and subtracting. (T. 54.) In a function report, Plaintiff indicated he did not have problems with self-care activities such as dressing, bathing, shaving, feeding himself, or using the toilet. (T. 214-15.) He reported occasionally cooking, doing dishes and occasionally doing laundry, grocery shopping twice per month, watching television, sitting on his porch, and engaging in social activities with family twice a week. (T. 215-18.)

On July 6, 2012, Plaintiff reported to Matthew Myette, P.T., that he had free weights and a Total Gym at home for exercise. (T. 357.) On September 19, 2012, examining physician Dr. Russell noted that Plaintiff was muscular with broad strong shoulders and arms like a weight lifter and that Plaintiff had reported he was still lifting weights. (T. 375, 378.) On February 28, 2013, Plaintiff reported he was being careful when exercising. (T. 557.) On August 5, 2013, Plaintiff was noted to be performing physical therapy exercises without difficulty other than some issues with supine straight leg raising. (T. 571.) On March 31, 2014, Plaintiff reported he was a little sore from doing more yoga and home exercises. (T. 585.) On April 7, 2014, Plaintiff's wife reported that he was doing various exercises on his Total Gym at home. (T. 587.) On April 23, 2014, Plaintiff reported he was doing his exercises on a regular basis. (T. 589.)

Plaintiff argues that these activities do not provide substantial evidence to support the ALJ's credibility finding because the ALJ failed to show that these activities were comparable to full-time work or that they showed an ability to perform light work specifically, citing *Balsamo*

*v. Chater*, 142 F.3d 75, 81-82 (2d Cir. 1998) as support for his argument. (Dkt. No. 9 at 8-9.) However, *Balsamo* presents a different situation than the one present in Plaintiff's claim.

In *Balsamo*, the Second Circuit found error in the ALJ's citation to the plaintiff's ability to periodically attend church and go shopping with his wife on occasion as evidence the plaintiff was not homebound in order to support the ALJ's ultimate determination that the plaintiff could perform sedentary work. *Balsamo*, 142 F.3d at 81. However, in the case now before this Court, Plaintiff's reported activities (as detailed above) are well beyond the level of what the plaintiff reported in *Balsamo* and include the ability to perform daily activities on a much more regular basis. While Plaintiff is correct in stating that the ALJ cannot expect a claimant to be completely incapacitated in order to be disabled as the ALJ did in *Balsamo*, the ALJ did not hold Plaintiff to any such extreme standard here. *See Morris v. Comm'r of Soc. Sec.,* No. 12-CV-1795 (MAD/CFH), 2014 WL 1451996, at *8 (N.D.N.Y. Apr. 14, 2014) ("The issue is not whether Plaintiff's limited ability to undertake normal daily activities demonstrates her ability to work. Rather, the issue is whether the ALJ properly discounted Plaintiff's testimony regarding her symptoms to the extent that it is inconsistent with other evidence.")

There was nothing unreasonable in the ALJ's determination that the picture presented by consideration of Plaintiff's activities as a whole, particularly when considered in conjunction with the medical treatment evidence and the opinion evidence, was not consistent with the significant limitations Plaintiff alleged. This Court declines to re-weigh the evidence in search of a different conclusion where, as here, there is substantial evidence to support the ALJ's conclusion. *Schlichting*, 11 F. Supp. 3d at 206. Additionally, the extent of a claimant's activities of daily living is one of the specific factors the ALJ is required to consider when assessing

credibility. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); SSR 96-7p, 1996 WL 374186 (July 2, 1996).[3] The ALJ's consideration of Plaintiff's activities of daily living was therefore proper under the applicable legal standards and constituted a specific and clear reason for the adverse credibility finding.

In addition to assessing Plaintiff's activities of daily living, the ALJ also pointed to multiple other specific and clear reasons for the adverse credibility determination, as already noted above. Plaintiff does not challenge the validity of the ALJ's citation to the fact that Plaintiff only had a single seizure within the relevant period and that imaging of his shoulder and neck showed little abnormality, despite Plaintiff listing these impairments as ones impacting his disability status. (T. 201.) Although Plaintiff does argue that certain portions of the record do show mental health symptoms, Plaintiff's selective reading of the evidence does not undermine the fact that the ALJ's finding was supported by substantial evidence, including the fact that Plaintiff was not noted to have abnormal psychiatric findings on routine physical examinations and the few sources who did examine him specifically in relation to his mental impairments

---

[3]      SSR 96-7p was superseded by SSR 16-3p when that newer Ruling became effective on March 28, 2016. However, because the final Agency decision was issued prior to that date, this Court will apply the Ruling that was in effect when that final Agency decision was rendered. *See Hoke v. Colvin*, No. 1:14-CV-0663 (GTS/CFH), 2015 WL 3901807, at *17 (N.D.N.Y. June 25, 2015) (finding no error in the ALJ's consideration of Global Assessment of Functioning ("GAF") scores because the court indicated that the plaintiff had not provided any evidence that a more recently-accepted SSA policy regarding GAF scores was intended to be applied retroactively); *Nutkins v. Shalala*, No. 92-CV-0040 (TMH/GJD), 1994 WL 714252, at *3 (N.D.N.Y. Dec. 22, 1994) (declining to apply a new regulation retroactively to the plaintiff's claim) (citing *NLRB v. Long Island College Hosp.*, 20 F.3d 76, 81 (2d Cir. 1994)). However, this Court does note that both SSR 96-7p and SSR 16-3p indicate that the ALJ is required to consider a claimant's activities of daily living when assessing credibility. *See* SSR 96-7p, 1996 WL 374186; SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016).

noted primarily mild symptoms other than the few discrete examples Plaintiff highlights.[4]  (*See, e.g.*, T. 375-77, 448, 457, 466-67, 595-96.)

Additionally, Plaintiff argues that the ALJ erred in classifying his treatment as conservative because of his history of left hip arthroscopy and total left hip replacement.  (Dkt. No. 9 at 8.)  However, because the ALJ has provided other specific and clear reasons supporting the credibility determination, whether or not the ALJ's classification of Plaintiff's treatment was inappropriate is at most harmless error because those other reasons necessitate that this Court uphold the ALJ's credibility finding.  *See Schlichting*, 11 F. Supp. 3d at 206-07 (finding harmless error in the ALJ's adverse inference of a failure to pursue treatment where the credibility analysis as a whole was supported by substantial evidence); *see also Taylor v. Colvin*, No. 3:14-CV-0928 (GTS), 2016 WL 1049000, at *8-9 (N.D.N.Y. Mar. 11, 2016) (noting that the ALJ's failure to inquire into the reasons for gaps in mental health treatment prior to using those gaps against the plaintiff's credibility was harmless where the ALJ provided other reasons supported by substantial evidence to support the overall credibility determination).

In terms of Plaintiff's earnings record, the evidence shows that Plaintiff had yearly earnings falling below the presumptive level of substantial gainful activity ("SGA") between 1990 and 2008, though he did earn amounts around or above SGA from 2009 through 2012.  (T. 175-76.)  While the ALJ did not explicitly state that Plaintiff's earnings history reflected adversely on his credibility, an ALJ is entitled to consider a claimant's work history as a factor

---

[4]     Although Plaintiff also puts forth case law seemingly to argue that the ALJ is not permitted to use a lack of mental health treatment against him when assessing credibility, as Defendant notes, the ALJ never actually indicates that Plaintiff is less credible based on a lack of mental health treatment.  (Dkt. No. 9 at 11; Dkt No. 10 at 8.)  Rather, the ALJ indicated that few out of all of the examinations in the record revealed mood abnormalities.  (T. 19.)

when making a credibility determination. *See Stroud v. Comm'r of Soc. Sec.*, No. 13-CV-3251 (AT/JCF), 2014 WL 4652581, at *11 (S.D.N.Y. Sept. 8, 2014) ("'A claimant's unexplained poor work history may negatively impact on the claimant's credibility.'") (quoting *Marine v. Barnhart*, No. 00-CV-9392 (GBD), 2003 WL 22434094, at *4 (S.D.N.Y. Oct. 24, 2003)); *Ellis v. Comm'r of Soc. Sec.*, No. 3:11-CV-1205 (GTS/ATB), 2012 WL 5464632, at *12 (N.D.N.Y. Sept. 7, 2012) ("Although work history may be deemed probative of credibility, it is one of the many factors to be considered.") (citing *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012); *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011)).  Although the ALJ did not elaborate as to what extent this consideration factored into the credibility determination and instead merely indicated that it "did not enhance" Plaintiff's credibility, there was no error in the ALJ's choice to assess or mention it in relation to Plaintiff's credibility.  (T. 20.)

For all these reasons, the credibility determination is supported by substantial evidence, and remand is not required on this basis.

### B.      Whether the ALJ Properly Weighed the Opinion Evidence

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (*See* Dkt. No. 10 at 8-15.)  To those reasons, the Court adds the following analysis.

In terms of weighing opinion evidence, the Second Circuit has long recognized the "treating physician rule" set out in 20 C.F.R. §§ 404.1527(c) and 416.927(c).  "Thus, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case

record." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d

117, 128 (2d Cir. 2008)). However, there are situations where the treating physician's opinion is

not entitled to controlling weight, in which case "the ALJ must explicitly consider, *inter alia*: (1)

the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence

supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence;

and (4) whether the physician is a specialist.'" *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*,

708 F.3d 409, 418 (2d Cir. 2013)). "Where an ALJ's reasoning and adherence to the Regulations

is clear, she is not required to explicitly go through each and every factor of the Regulation."

*Blinkovitch v. Comm'r of Soc. Sec.*, No. 3:15-CV-1196 (GTS/WBC), 2017 WL 782979, at *4

(N.D.N.Y. Jan. 23, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)), *adopted

by* 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017). After considering these factors, "the ALJ must

'comprehensively set forth [his] reasons for the weight assigned to a treating physician's

opinion.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129). "The failure to provide

'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for

remand." *Id*. (quoting *Burgess*, 537 F.3d at 129-30).

      The factors for considering opinions from non-treating medical sources are the same as

those for assessing treating sources, with the consideration of whether the source examined the

claimant replacing the consideration of the treatment relationship between the source and the

claimant. *See* 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). Additionally, when weighing

opinions from sources who are not considered "medically acceptable sources"[5] under the

---

[5]     Medically acceptable sources are noted to include the following: licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

regulations, the ALJ must consider the same factors as used for evaluating opinions from medically acceptable sources. *Saxon v. Astrue*, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011) (citing *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010)); SSR 06-03p, 2006 WL 2329939.

In terms of Plaintiff's physical functioning, the ALJ afforded great weight to consultative examiner Dr. Jenouri's opinion that Plaintiff should avoid operating machinery, finding that limitation consistent with Plaintiff's seizure history; however, the ALJ declined to accept Dr. Jenouri's opinion that Plaintiff should avoid driving because "his treating neurologist indicates the claimant is now eligible to drive due to his lack of seizures." (T. 20.) Similarly, the ALJ indicated he afforded great weight to the March 15, 2012, opinion from Nurse Practitioner ("N.P.") Sherrie Adler that Plaintiff should exercise seizure precautions "including no driving, operating heavy machinery, climbing on ladders, [and] being under open flame for a minimum of six months," noting the same reasons. *Id.*

The ALJ afforded some weight to the opinion from treating physician Dr. Bennett, noting that Dr. Bennett is "an acceptable medical source with specialized experience in orthopedic surgery." (T. 20.) The ALJ found that Dr. Bennett's opinion that Plaintiff could lift over ten pounds and had no restrictions in standing or walking were consistent with the medical imaging, presentation during exams, positive response to orthopedic treatment, and Plaintiff's reports that he performed light housework and light exercise. *Id.* The ALJ declined to afford greater weight to Dr. Bennett's opinion that Plaintiff could sit less than six hours, that he would be off-task more than 20 percent of the workday, and that he would miss two days of work per month because he found these restrictions unsupported by Dr. Bennett's treatment records and the other

clinical findings in the record that failed to show difficulties remaining seated, maintaining attention, or regularly attending appointments; the ALJ also found these restrictions inconsistent with Plaintiff's reported daily activities.  *Id*.

The ALJ also afforded some weight to the opinion from P.A. Hodgeman, noting that although P.A. Hodgeman was not an acceptable medical source, he had a treatment relationship with Plaintiff.  (T. 20.)  The ALJ found that P.A. Hodgeman's opinion that Plaintiff could lift and carry 10 to 30 pounds, that he had no limitations in sitting or walking, and that he had moderate limitations in squatting and bending were consistent with Plaintiff's impairments and his reports of reduced physical activities since the alleged onset date.  *Id*.  However, the ALJ declined to afford greater weight to the remainder of P.A. Hodgeman's opinion indicating a moderate limitation in standing because the ALJ found that limitation inconsistent with Plaintiff's presentation at examinations and with his reported activities of daily living.  *Id*.

In terms of Plaintiff's mental functioning, the ALJ afforded great weight to State Agency psychiatric consultant Dr. Blackwell's opinion that Plaintiff could perform at least unskilled simple work because he found that opinion consistent with the intellectual testing, Plaintiff's presentation during exams, his positive response to conservative mental health treatment, and his reported activities of daily living.  (T. 20-21.)  The ALJ also afforded great weight to the opinion of examining physician Dr. Russell that Plaintiff would be able to perform jobs requiring little knowledge of writing or math, citing the same reasons.  (T. 21.)

The ALJ afforded some weight to the opinion of consultative examiner Dr. Loomis that Plaintiff could perform simple tasks but had some mild deficits in attention, concentration, and performing complex tasks, finding this opinion was consistent with the intellectual testing,

Plaintiff's presentation during exams, his positive response to conservative mental health treatment, and his reported activities of daily living. (T. 21.)

Plaintiff argues that the ALJ erred in weighing the above opinions, providing a number of reasons specific to each opinion, but this Court does not find Plaintiff's arguments as a whole persuasive. (*See* Dkt. NO. 9 at 13-20.) As can be seen from the above discussion, the ALJ explicitly indicated the weight he afforded to each opinion, specifically highlighted what portions of opinions he accepted or rejected, and provided specific reasons for that acceptance or rejection. (T. 20-21.) The ALJ's discussion shows that he appropriately considered the relevant factors for assessing opinion evidence as well. *Id.*; *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). The majority of Plaintiff's more specific arguments in which he cites to some evidence that supports his assertions are little more than requests that this Court re-weigh the evidence, something that is not permitted within the limited scope of review for this appeal. *Lewis v. Colvin*, 122 F. Supp. 3d 1, 7 (N.D.N.Y. 2015) (noting that, even where a plaintiff can point to some evidence that supports his position, "a reviewing court 'defers to the Commissioner's resolution of conflicting evidence'" and "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard") (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)).

Plaintiff argues that the ALJ erred specifically in rejecting P.A. Hodgeman's limitation that Plaintiff would be moderately limited in standing, a term which is defined within the form used as twenty-five percent. (T. 291.) However, Plaintiff does not show how this rejection in

any way impacted the validity of the ALJ's decision.[6]  Additionally, Plaintiff's assertion that there was a gap in the record due to what he asserts is a lack of a functional opinion related to Plaintiff's ability to stand and walk is not persuasive for one key reason: Dr. Bennett's opinion, which included a statement that Plaintiff could stand and walk eight hours in an eight hour workday, was rendered in July 2014, a year after Plaintiff's total left hip replacement.  (T. 666, 672-73.)  Although Dr. Bennett treated Plaintiff for his spinal impairment, treatment records show that Dr. Bennett also addressed Plaintiff's hip concerns personally and was aware of Plaintiff's treatment for his left hip, including his surgery and his leg length discrepancy.  (T. 449-50, 454, 629-30.)  On April 25, 2014, Dr. Bennett observed Plaintiff ambulated with a steady gait and no ataxia.  (T. 629.)  His other examinations from July 2012 through January 2013 showed fairly little ongoing abnormality of functioning related to either Plaintiff's back or hip.  (T. 448-55.)  The physical therapy and other treatment from the period after Plaintiff's hip replacement shows that tenderness and other symptoms were ongoing, but do not support Plaintiff's assertions that Plaintiff's hip pain and leg length discrepancy post-surgery caused greater overall limitations in Plaintiff's ability to stand and walk.  (*See, e.g.*, T. 538, 575-81, 587, 589-90, 592-94, 637, 640, 642.)  Because Dr. Bennett's opinion was rendered after Plaintiff's total hip replacement and the treatment evidence does not contradict the ALJ's findings regarding Plaintiff's ability to stand and walk, there was no need to engage in further development of the record on that issue.

---

[6]     An opinion that Plaintiff was twenty-five percent limited in his ability to stand seems to indicate that Plaintiff would still be able to stand six hours in an eight-hour workday, as twenty-five percent of eight hours equals two hours.  Given that the ALJ found Plaintiff capable of standing for six hours in an eight-hour workday, there does not appear to actually be a clear inconsistency between the RFC finding and PA Hodgeman's limitation, whether or not the ALJ afforded less weight to that limitation.

Additionally, in terms of the opinions related to Plaintiff's mental impairments, Plaintiff's argument that those opinions were somehow unreliable because they were rendered prior to Plaintiff's two psychiatric hospitalizations is not availing. (Dkt. No. 9 at 17-18.) As will be discussed in greater detail in Part III.C of this Decision and Order, the evidence does not support greater ongoing limitations stemming from Plaintiff's mood disorder and fails to show that the symptoms Plaintiff displayed during his two hospitalizations were similar to the severity of symptoms he experienced on a typical basis before or after those temporary exacerbations. The ALJ notes Plaintiff's hospitalizations in his discussion of the evidence, indicating that he considered them when making his determination. (T. 15, 19.)

In terms of the ALJ's decision to afford no weight to various statements that generically indicated Plaintiff was disabled, the ALJ was entitled to decline to rely on these statements because the question of whether a claimant is disabled is an issue reserved to the Commissioner. *Mortise v. Astrue*, 713 F. Supp. 2d 111, 125 (N.D.N.Y. 2010) ("[A]n opinion concerning the ultimate issue of disability, from any source, is reserved to the commissioner."); *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 267 (N.D.N.Y. 2013) (holding "[i]t was proper to give little weight to [a doctor's] opinion, which concerned issues reserved to the Commissioner," where the opinion in question consisted of statements that the plaintiff was severely disabled and not competitively unemployable) (citing 20 C.F.R. § 416.927(d)(1)). Contrary to Plaintiff's arguments, there was no need for the ALJ to re-contact these sources in an effort to obtain clarification or a functional assessment. There were multiple other opinions that did outline more specific functional restrictions, including opinions from Plaintiff's treating sources. Therefore, there was no gap in the record that needed to be further developed and the ALJ had

more than adequate evidence to enable him to make a conclusion on the issue of Plaintiff's disability. It is clear from the ALJ's discussion of the functional opinion evidence and the medical and other evidence that the ALJ considered the evidence as a whole and his decision to reject these opinions was supported by substantial evidence.

For all these reasons, the weight the ALJ afforded to the opinion evidence in the record is supported by substantial evidence and consistent with applicable legal standards, and remand is not required on this basis.

**C.    Whether the ALJ Adequately Accounted for Plaintiff's Mental Impairments With a Limitation for Simple, Routine, and Repetitive Work**

After carefully considering the matter, the Court answers this question in the negative for the reasons outlined below.

Residual functional capacity ("RFC") is defined as

> what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)). "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374184, at *6; *accord* SSR 85-15, 1985 WL 56857 (Jan. 1, 1985). "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the

RFC assessment.'" *Hendrickson v. Astrue*, No. 5:11-CV-0927 (LEK/ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *8).

Plaintiff argues that the ALJ's limitation to "simple work" did not accurately account for Plaintiff's psychiatric symptoms, which Plaintiff asserts included issues with "anxiety, stress, and his thinking processes." (Dkt. No. 9 at 12-13.) Plaintiff further argues that the ALJ erred in failing to address how Plaintiff's preoccupation with his physical impairments and symptoms that were noted on a few examinations during and around the time of his psychiatric hospitalizations impacted his ability to perform the basic mental demands of unskilled work. *Id.* Despite these arguments, Plaintiff fails to point to any evidence that these symptoms of his mood disorder and preoccupation with his physical condition imposed any specific mental limitations that were not encompassed by the ALJ's restriction to simple, routine, and repetitive tasks.

It is important to note that the symptoms Plaintiff highlights, while serious, do not appear to describe Plaintiff's typical mental state. Although the record does show that Plaintiff experienced temporary exacerbations of mental health symptoms that resulted in psychiatric hospital admissions from November 24, 2013, to December 8, 2013, and from January 27, 2014, to February 4, 2014, these are the only two instances where Plaintiff was observed to have such serious symptoms. (T. 525-29, 531-36.) Plaintiff had stabilized on medication by the time he was discharged from the 2013 admission with no subsequent mental health treatment until the 2014 psychiatric admission, at which time Plaintiff reported that he had been off his medication for about a week due to missing an outpatient follow-up with his psychiatrist. (T. 527.) Consequently, it appears Plaintiff's suicide attempt that led to the second psychiatric hospitalization was based in part on non-compliance with his medications; there is no evidence

that Plaintiff continued to experience such severe symptoms while compliant with his prescribed medications.

On March 26, 2014, N.P. Amy Cron did observe that Plaintiff was pleasant, was very focused on his back and hip problems rather than his mental health, had slow and soft-spoken speech, reported auditory and visual hallucinations, displayed a circumstantial and tangential thought process with distractibility, was preoccupied, and had fair intellectual functioning and attention with fair-to-poor concentration, insight, and judgment; N.P. Cron also noted his prescribed medications included clonazepam, Seroquel, and Zoloft.[7] (T. 595-96.) However, on April 9, 2014, N.P. Cron noted that Plaintiff had no current mood issues, though he "[s]till struggles to articulate what was going on with him when he tried to kill himself." (T. 600.) N.P. Cron observed his affect was euthymic and appropriate, his perceptions were appropriate, he had an organized but circumstantial and tangential thought process, he was preoccupied with his hip problems, and he had an average intellect and fair concentration, attention, insight, and judgment. *Id.* On May 14, 2014, and June 11, 2014, N.P. Cron observed Plaintiff had a circumstantial thought process with preoccupations on his hip problems, but mental status examinations were otherwise normal. (T. 603, 606.) The mental treatment evidence therefore

---

[7]      Clonazepam is a medication prescribed variously for seizures, anxiety, and panic attacks. *Clonazepam*, NATIONAL INSTITUTE OF HEALTH U.S. NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/druginfo/meds/a682279.html (last visited June 28, 2017). Seroquel (generic name quetiapine) is a medication variously prescribed for schizophrenia or mania and depression associated with bipolar disorder. *Quetiapine*, NATIONAL INSTITUTE OF HEALTH U.S. NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/druginfo/meds/a698019.html (last visited June 28, 2017). Zoloft (generic name sertraline) is a medication variously prescribed to treat depression, obsessive compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety. *Sertraline*, NATIONAL INSTITUTE OF HEALTH U.S. NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/druginfo/meds/a697048.html (last visited June 28, 2017).

does not support Plaintiff's contentions that he continued to suffer from the same severity of mental health symptoms that he displayed at the beginning of his two hospitalizations.

Nor does the evidence in the record indicate that Plaintiff suffered from any ongoing mental limitations as a result of his mood disorder that were not encompassed within a restriction to simple, routine, and repetitive tasks. Consultative examiner Dr. Loomis found Plaintiff capable of dealing with simple instructions, directions, and tasks, with only a mild impairment in his ability to maintain attention and concentration and to perform complex tasks, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (T. 467.) However, a mild restriction does not indicate that the ALJ was required to include a limitation in the RFC assessment beyond limiting Plaintiff to simple, routine, and repetitive tasks; indeed, the record does not support any obvious greater restrictions in these areas of functioning. Dr. Blackwell found Plaintiff capable of performing unskilled and some semiskilled work. (T. 68.) These opinions and the overall mental health treatment evidence provide substantial evidence supporting the ALJ's limitation to simple, routine, and repetitive tasks, and Plaintiff has not shown what other specific mental limitations have not been accounted for with this restriction. *See Burrows v. Comm'r of Soc. Sec.*, No. 3:15-CV-1266 (GTS/WBC), 2017 WL 1274177, at *8-9 (N.D.N.Y. Mar. 3, 2017) *adopted by* 2017 WL 1162195 (Mar. 28, 2017) (finding that the ALJ was not required to account for additional limitations where substantial evidence supported his mental RFC determination).

However, the evidence related to Plaintiff's learning disorder, an impairment that the ALJ also found severe, is a different matter. The ALJ afforded great weight to Dr. Russell's opinion that Plaintiff "would be able to perform jobs requiring little knowledge of writing or math," noting that it was consistent with the intellectual testing, Plaintiff's presentation on examinations,

his positive response to conservative mental health treatment, and reported activities of daily living. (T. 21.) Yet, the ALJ did not include in the RFC any specific limitation related to the extent of reading and math Plaintiff can perform in the workplace. (T. 18.)

This Court is not convinced that a limitation to simple, routine, and repetitive tasks clearly encompasses the extent of limitation in Plaintiff's reading and math abilities that is shown in the record. For example, Dr. Russell performed testing that showed Plaintiff performed at a 4th grade level in both reading and arithmetic. (T. 377.) He further noted that Plaintiff's functional academics were weak and that Plaintiff reported anxiety when his math or reading skills were tested at jobs. (T. 378.) Plaintiff made similar reports at the hearing, indicating he used to beg not to have to do reading or writing portions of things and he would simply copy words from other places if he needed to write something specific on reports when he was previously working. (T. 44-45.) He also reported failing the written portion of his driver's test at least once due to his issues with reading. (T. 36.)

The ALJ's failure to explain why he chose not to incorporate a limitation related to Plaintiff's reading and writing abilities despite explicitly affording great weight to Dr. Russell's opinion indicating such limitations leaves the ALJ's decision lacking the clarity necessary to enable this Court to determine whether the ALJ's findings are supported by substantial evidence. *See Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012) ("A court 'cannot . . . conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered.'") (quoting *Morgan ex. rel. of Morgan v. Chater*, 913 F. Supp. 184, 188-89 (W.D.N.Y. 1996)); *Lee v. Astrue*, No. 10-CV-6036 (CJS), 2011 WL 1675101, at *7-8 (W.D.N.Y.

May 4, 2011) (finding error meriting remand where the ALJ's decision was internally inconsistent).

Although Dr. Russell noted that, "[i]f he were physically able, he would be appropriate for many other jobs requiring little knowledge of math and writing," Dr. Russell did not assess Plaintiff's physical ability, nor is he a vocational expert, so this statement does not substitute for actual vocational evidence that Plaintiff remained able to work when all the supported limitations are considered. The ALJ limited Plaintiff to a range of light work in addition to his mental and cognitive-related limitations. (T. 18.) In making his Step Five determination that Plaintiff remained able to perform a significant number of jobs in the national economy, the ALJ relied on the Medical-Vocational Guidelines as a framework for decision-making. The Medical-Vocational Guidelines, however, do not expressly contemplate a restriction for minimal reading and math,[8] and reading and math skills are not clearly encompassed in a limitation to simple, routine, and repetitive tasks.

The ALJ does not make any attempt to explain how a limitation for "little knowledge of reading and math," in combination with Plaintiff's other limitations, would not significantly erode the occupational base of unskilled light work, nor do any of the Social Security Rulings he cites speak to the impact such a restriction would have on the occupational base of unskilled work. (T. 22.) *See also* SSR 83-14, 1983 WL 31254; SSR 85-15, 1985 WL 56857. Had the ALJ properly included this limitation in the RFC consistent with the weight he afforded to Dr.

---

[8]    The Medical-Vocational Guidelines do include a consideration of whether an individual is literate or not as part of the educational considerations; however, this still does not address whether a limitation in the ability to perform basic work-related mathematics tasks would significantly erode the occupational base of other work in the national economy. *See generally* 20 C.F.R. § 404, Subpart P, App. II.

Russell's opinion, consultation with a vocational expert would have been necessary to determine the effect this limitation would have the occupational based of unskilled light work. *See Zabala v. Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010) (noting that "[i]f a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert") (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The ALJ's failure to reconcile the weight afforded to Dr. Russell's opinion with the RFC determination is therefore harmful error because it is impossible for this Court to determine whether the ALJ's ultimate Step Five finding is supported by substantial evidence as a result of this error.

For all these reasons, the ALJ's mental RFC did not clearly account for all of the mental limitations supported by the record. Remand is required for the ALJ to provide further explanation for the inconsistency between his findings that Plaintiff's learning disorder was a severe impairment and that Dr. Russell's opinion was entitled to great weight, and the omission of any limitation relating to Plaintiff's work-related reading and math capabilities.

### D. Whether the Step Five Finding is Supported By Substantial Evidence

Due to the ALJ's lack of explanation as to why he failed to include limitations related to Plaintiff's reading and math abilities in the RFC despite affording Dr. Russell's opinion great weight, on remand, the ALJ will need to re-evaluate Plaintiff's ability to perform other work in the national economy at Step Five of the sequential evaluation, including obtaining vocational expert testimony to determine the impact of Plaintiff's reading and math abilities on his ability to perform unskilled light work.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is

**GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 10) is

**DENIED** in part and **GRANTED** in part; and it is further

**ORDERED** that this matter is **REMANDED** to Defendant, pursuant to Sentence Four of

42 U.S.C. § 405(g), for further proceedings consistent with this Decision and Order.


Dated: June 29, 2017
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge